United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL MOODY, | No. C 07-01017 MHP |
| Plaintiff, | |
| v. | **MEMORANDUM & ORDER** |
| LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, et al., | **Re: Cross-Motions for Summary Judgment/Summary Adjudication** |
| Defendants. | |

Plaintiff Michael Moody ("Moody") brings this action under 29 U.S.C., section 1132(a)(1)(B), seeking benefits under the Group Disability Income Policy ("the policy") issued by Liberty Life Assurance Company of Boston ("Liberty") to Moody's former employer, Synopsis, Inc. Now before the court are the parties' cross-motions for judgment.[1] The court, having read and considered the documentary evidence and the written submissions of the parties, now makes the following Findings of Fact and Conclusions of Law. To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

FINDINGS OF FACT

1. Moody is a beneficiary under Group Disability Income Policy, sponsored by Synopsis, Inc. This is not disputed.

2. The policy contains the following definition, which delineates separate "own occupation" and "any occupation" provisions:

"Disability" or "Disabled" means:

1. For persons other than pilots, co-pilots, and crew of an aircraft:

    i. If the Covered Person is eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties *of his occupation* on an Active Employment basis because of an Injury or Sickness; and

    ii. After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties *of his own or any other occupation* for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

P-006 (emphasis added).

3. The policy also provides: "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." P-025.

4. The policy also provides: "Liberty, at its own expense, will have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined by a Physician or vocational expert of its choice. This right may be used as often as reasonably required." P-027.

5. Moody suffered an onset of cervical spine pain following an automobile accident in September 2001. Moody had, in 1989, a C6-7 spinal fusion necessitated by a rugby accident. Until the 2001 automobile accident, it appeared that Moody had recovered fully from the rugby accident. Following the 2001 accident, Moody reported severe neck, arm, and back pain. AR-0793-0794.

6. After trying various conservative techniques, Moody had a cervical fusion operation at C5-6 on October 6, 2003. AR-1236-1237.

7. At the time, Moody was employed by Synopsis, Inc. Liberty has described Moody's occupation as that of a "project engineer," a description that Moody does not here contest. See AR-0649. Moody has characterized his job as "a balance between an executive account manager / business development representative and a R&D manager / technical support manager / technical program coordinator." AR-0590; see also AR-1227 (Moody's résumé).

8. On January 2, 2004, Moody applied for long term disability benefits under the policy. AR-1294.

9. After an initial approval of benefits, Liberty denied Moody continuing benefits on June 21, 2004. AR-1172.

10. On June 28, 2004, Moody's treating physician, Dr. Jeffrey Saal, wrote Liberty's internal reviewing physician, Dr. Nathan Prahlow, to explain that Moody would be unable to work for the following two to four months. AR-1159. Moody also sent additional medical records to Liberty. AR-1071-1152, 1162-1171.

11. Upon reviewing the records and Saal's letter, Prahlow agreed that the restriction of not working was reasonable, although based on Moody's self-reports; Prahlow also noted that Saal is "a national leader in the field of Physical Medicine & Rehabilitation." AR-1057-58.

12. Liberty subsequently hired investigators to place Moody under surveillance for three days in September-October 2004, during which time Moody was occasionally seen to be moderately active, including driving, walking, and conducting errands. AR-1039-1041.

3

13. On November 30, 2004, Liberty reinstated Moody's disability benefits. AR-1037.

14. Liberty required Moody to complete a Functional Capacity Evaluation (FCE), which was done on March 7, 2005. AR-0767.

15. The evaluator, Tiffany Tang, concluded that Moody could work only in the "Sedentary Work" Physical Demand Category as defined by the U.S. Department of Labor. Id. Sedentary work is defined as "Exerting up to 10 lbs. occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including human body." Id.

16. Tang's full conclusion was as follows:

> The results of this evaluation indicate that Michael Moody is capable of working in the sedentary physical demand category, according to the U.S. Department of Labor (DOT) Work Classification Level in an 8 hour time period. His demonstrated capabilities matched most of those of a project engineer except lifting and carrying in the light category, reaching at desk level. Reaching and neck rotation appeared to increase his pain significantly as his heart rate increased dramatically with these activities. Due to his high resting heart rate in standing, lifting and carrying were not performed. His demonstrated behavior and capabilities where consistent throughout the evaluation.

Id.

17. Liberty also commissioned further surveillance during three days in early March 2005. The surveillance report described Moody as being "moderately active outside of his residence including driving, walking, jogging a short distance, and shopping." A-0761

18. Liberty also referred Moody's case to an independent peer reviewer, Dr. L. Neena Madireddi. On April 5, 2005, Madireddi determined, based on her review of Moody's medical records, that Moody could lift up to thirty pounds on an occasional basis and twenty pounds on a frequent basis. AR-0890. She also found that the medical evidence did not support restrictions on sitting, standing, or walking. AR-0891. Madireddi stated that the surveillance tape taken of Moody "does not

4

provide additional supportive evidence to conflict or contradict Mr. Moody's clinical assessment." AR-0894.

19. In the meantime, Dr. Saal was given an opportunity to review the results of the FCE. He informed Liberty that the FCE "did not document the most important part of Mr. Moody's functional capacity need as it relates to work, and that is in sitting tolerance." AR-0690 (April 18, 2005, letter from Saal to Liberty). Saal also wrote, "The findings that are not present in the [FCE] that are more appropriate and necessary to determine his ability to return to work are his sitting inability, the need for rest periods during the day to pursue any level of activity, and the use of narcotic analgesic medications, which limit his physical capacity, mental capacity, and conditioning capacity." AR-0691.

20. On April 25, 2005, Liberty was provided with a labor market survey that it commissioned. AR-0667-0681. The survey was based on responses from twenty companies found to employ individuals in the same occupation as Moody. The survey asked about physical requirements but did not specifically ask about cognitive requirements for the occupation. See id.

21. On April 28, 2005, Madireddi submitted an addendum report to Liberty based upon the issues raised by Saal's April 18 letter. AR-0654-0655. Madireddi concluded, without additional analysis, that "the available medical evidence continues to support the restrictions and limitations as outlined in my original report . . . . The letter from Dr. Saal does not provide additional medical evidence . . . ." AR-0655.

22. On May 23, 2005, Liberty sent Moody a letter informing Moody that he was no longer eligible for benefits. AR-0648-0653.

5

23. Relying heavily on Madireddi's reports, Liberty concluded that Moody could return to work. The letter also noted that Moody's "occupation as a Project Engineer is typically performed within the light physical demand level." AR-0651.

24. While the letter noted that Saal had reported Moody's concentration and mental capacity to be limited by high doses of narcotic analgesics, the letter did not set forth any analysis or evidence contradicting Saal's report. Id.

25. Moody requested, on August 28, 2005, that his denial be overturned. AR-0587.

26. Moody provided additional records on October 1, 2005, including records of sessions with his psychiatric/pain management specialist, Dr. Robert Hines, Jr. See AR-0325-0500.

27. In early October 2005, Liberty's employee Chuck Jones wrote in an internal "Appeal Recommendations" document: ". . . the clmt has the capacity to perform a sedentary occupation . . . The medical information supports he can perform a sedentary occupation . . . Maintain denial – not TD own occupation." AR-0469.

28. Liberty, through Chuck Jones, informed Moody on October 10, 2005, that his appeal had been denied. AR-0243-0250. Liberty restated Madireddi's conclusions and stated that it also relied upon the report of a second independent specialist, Dr. Andrea Wagner. AR-0247, 0262-0282 (full report).

29. Dr. Wagner's review repeatedly emphasized the lack of "objective" evidence to support Moody's claims of physical impairment. AR-0247. Wagner also dismissed Moody's claims of cognitive impairment on the basis that Saal "[did] not provide any neuropsychological data to

1 support his view that chronic use of narcotics has affected Mr. Moody's function." AR-0248. The
2 letter does not describe what sort of data would qualify as objective supporting evidence.

4 30. The letter states that Moody's occupation is "typically performed within the light physical
5 demand level." AR-0249.

7 31. On October 16, 2008, Wagner reviewed the documents that Moody had sent on October 1,
8 2005, which had not arrived in time to be considered for her earlier report. Wagner stated that
9 Hines, like Saal, had failed to provide "objective information" to support his impressions. AR-0322.
10 She also wrote, "It is notable that Dr. Hines' records document that Mr. Moody's cognitive status
11 has remained intact. Therefore, the medical record does not provide any objective evidence of
12 impairment as a result of these medications." AR-0323. Wagner reported no change in her
13 assessment. AR-0323.

15 32. Liberty followed up with Moody on November 1, 2005, again confirming that his appeal had
16 been denied and citing Wagner's report and no change in her conclusion. AR-0240-0242.

18 33. This letter also asked Moody to remit $19,951.27 to Liberty, as had many previous letters. AR-
19 0241, 0852. This amount was Liberty's calculation of overpayments it had made to Moody from
20 June 21, 2004, to April 20, 2005, because benefits for state disability insurance had not been
21 subtracted from its payments per the provisions of the policy. AR-0852.

23 34. By June 23, 2006, Moody was represented by counsel, David M. Lilienstein of the Pillsbury &
24 Levinson law firm. Lilienstein wrote Liberty asking for a copy of the contents of Moody's claim file.
25 AR-0238.

27 35. Liberty responded on July 3, 2006. AR-0204.

7

36. Lilienstein again wrote Liberty on December 14, 2006. AR-0094-0203. Lilienstein's letter informed Liberty that the Social Security Administration had decided to grant Moody disability benefits.

37. The letter also informed Liberty that Moody had been personally examined by Madireddi in August 2005 as part of Moody's Social Security determination. Lilienstein argued that Madireddi's conclusions based upon her in-person examination of Moody conflicted with the conclusions of her earlier review of Moody's records for Liberty. AR-0094-0095.

38. The letter also included six other specific documents from the Social Security claim file, including the October 26, 2005, review of medical consultant Dr. Edward Wilson purportedly stating that Moody "has in effect a 'failed neck' syndrome . . . ." AR-0096. Lilienstein asked Liberty to consider these documents, as well as the Social Security determination, as evidence that Moody could not work.

39. Liberty replied two weeks later, reiterating its conclusion that its position remained unchanged. AR-0089-0093.

40. Liberty's letter noted that the latest letter from Lilienstein was received over one and half years after the denial and over one year since the appeal decision. AR0089-0090. It also noted that Lilienstein included parts of the Social Security record, but stated, "However, we have additional physician reviews, which did not contribute in the rationale for the Social Security award." AR-0090. The letter again quoted language from Madireddi and Wagner's earlier reviews of Moody's medical records.

41. The letter did not set forth any analysis of the additional records provided by Lilienstein—with one exception. Liberty analyzed the results of Madireddi's August 2005 in-person examination of Moody and argued that it did not contradict her earlier records review conducted for Liberty. Id.

42. Moody brought suit in the Superior Court for the State of California, County of San Francisco, in February 2007, and defendants promptly removed the action to this court. Docket No. 1.

43. As of October 6, 2008, Moody has continued to receive Social Security Disability benefits. Docket No. 72 (Moody Dec.) ¶ 2.

CONCLUSIONS OF LAW

I.     Standard of Review

1. ERISA provides for judicial review of a decision to deny benefits to an ERISA plan beneficiary. See 29 U.S.C. § 1132(a)(1)(B).

2. ERISA creates federal court jurisdiction to hear such a claim. See 29 U.S.C. § 1132(e).

3. In determining the appropriate standard of review, a court should be guided by principles of trust law, analogizing a plan administrator to the trustee of a common law trust. A benefit determination should be considered to be a fiduciary act, i.e., an act in which the administrator owes a special duty of loyalty to the plan beneficiaries. Metropolitan Life Ins. Co. v. Glenn, ___ U.S. ___, ___, 128 S.Ct. 2343, 2347 (2008), quoting Firestone v. Bruch Tire & Rubber Co., 489 U.S. 101, 111-113 (1989).

4. ERISA benefits determinations are to be reviewed *de novo*, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Glenn at 2348; see also Firestone at 115.

9

5. Where an administrator has retained discretionary authority, "trust principles make a deferential standard of review [i.e., review for abuse of discretion] appropriate." Glenn at 2348, quoting Firestone at 111. The court must evaluate all the facts and circumstances to make something "akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 969 (9th Cir. 2006).

6. An administrator has discretion only where it is "unambiguously retained." Kearney v. Stanford Ins. Co., 175 F.3d 1084, 1090 (9th Cir. 1999), quoting Bogue v. Ampex Corp., 976 F.2d 1319, 1325 (9th Cir. 1992). In this case, the parties agree that defendant retained such discretion. See P-025 (policy provision regarding "interpretation of the policy").

7. Where a benefit plan gives discretion to an administrator who is operating under a conflict of interest, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Glenn at 2348, quoting Firestone at 115. When judges review the lawfulness of benefit denials, they will take into account several considerations, of which a conflict of interest is one. Glenn at 2351. "The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and promote accuracy . . . ." Id. (internal citation omitted). The role that a conflict of interest will play will vary depending upon the circumstances of each case: there "are no talismanic words that can avoid the process of judgment." Id. at 2352.

8. A particular course of action can both justify giving more weight to a conflict and serve as an important factor in its own right. Id.

10

9. A conflict of interest can exist for ERISA purposes when a professional insurance company both evaluates claims as the plan administrator and pays benefits under the plan. See Glenn at 2349-2350. Such a conflict is considered to be a "structural" conflict of interest. Abatie at 965.

10. A court may view the decision of a conflicted administrator with a low level of skepticism "if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." Abatie at 968. On the other hand, a court may weigh a conflict more heavily "if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claimant's reliable evidence, or had repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." Id. at 968-969.

11. "Although an ERISA plan is a contract, ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans." Gilliam v. Nevada Power Co., 488 F.3d 1189, 1194 (9th Cir. 2007) (internal citations and quotations omitted). Courts therefore normally "apply contract principles derived from state law . . . guided by the policies expressed in ERISA and other federal labor laws." Id. These principles comprise a "nationally uniform federal common law" applied in the ERISA context. See Saltarelli v. Bob Bake Group Med. Trust, 35 F.3d 382, 386 (1994).

12. Under the uniform federal common law, courts should interpret plan terms "in an ordinary and popular sense as would a person of average intelligence and experience." Babikian v. Paul Revere Life Ins. Co., 63 F.3d 837, 840 (9th Cir. 1995), quoting Evans v. Safeco Life Ins. Co., 916 F.2d 1437, 1441 (9th Cir. 1990).

13. The court "may, in its discretion, consider evidence outside the administrative record to determine the nature, extent, and effect on the decision-making process of the conflict of interest; the

11

decision on the merits [under the abuse of discretion standard], though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic information or otherwise." Abatie at 970.

## II. Moody's Claim With Liberty

14. The plan at issue grants Liberty the discretion to make claim decisions. As noted, the appropriate standard of review under Firestone and Glenn in such a case is normally abuse of discretion, rather than *de novo* review. However, Liberty also acts as both the administrator of the plan at issue and the entity that pays benefits under the plan. Accordingly, Liberty has a structural conflict of interest. Under the framework set forth in Firestone and elaborated in Glenn, the court may look to Liberty's actions to determine how much weight should be given to the factor of Liberty's structural conflict of interest. The weight given to the conflict may, therefore, affect whether or not an abuse of discretion is found.

### A. Conflict of Interest

15. In the case at bar, Liberty's conflict of interest must be given relatively heavy weight, due to two separate types of conduct suggesting that Liberty' decision did not accord with its fiduciary role. In denying Moody's claims, Liberty inappropriately disregarded subjective evidence and engaged in a highly selective review of Moody's Social Security file.

#### i. Objective Evidence Requirement

16. Dr. Wagner's analysis, relied upon in the claim rejections letters of October 10, 2005, and November 1, 2005, rests heavily upon the fact that, in Wagner's view, Dr. Saal had not provided any "objective information" to support Moody's reports of cognitive impairment. See AR-0241, AR-0248. As was true in Sabatino v. Liberty Life Assurance Co. of Boston, 286 F. Supp. 2d 1222, 1231 (N.D. Cal. 2003) (Wilken, J.), there is no requirement in the policy that plaintiff present "objective" medical evidence to support his claim. A plan administrator "cannot exclude a claim for lack of

12

objective medical evidence unless the objective medical evidence standard was made clear, plain and conspicuous enough in the policy to negate layman plaintiff's objectively reasonable expectations of coverage." Id., quoting Duncan v. Continental Cas. Co., 1997 WL 88374 (N.D. Cal. 1997) (Illston, J.), at *4 (internal quotations and brackets deleted). Certainly, an administrator is not prohibited from taking into account the fact that there is a lack of objective evidence. Safavi v. SBC Disability Income Plan, 493 F. Supp. 2d 1107, 1118 (C.D. Cal. 2007) (rejecting argument that plan administrator should not be allowed to take lack of objective evidence into consideration at all).[2] However, reliance on objective evidence can be problematic for medical conditions that are not amenable to objective verification. Mitchell v. Metropolitan Life Ins. Co., 523 F. Supp. 2d 1132, 1146 (C.D. Cal. 2007) (holding, where policy did not include requirement of objective evidence, that demanding such evidence without explanation of what would satisfy the requirement constituted an abuse of discretion); see also Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 873 n.3 (9th Cir. 2008) (noting that disabling pain cannot always be measured objectively).

17. As noted, Liberty repeatedly cited a lack of objective evidence to support Moody's complaints of cognitive impairment due to his medications.[3] Yet Liberty's evaluating physicians had evidence showing consistent subjective complaints over a long period of time. More importantly, neither Madireddi nor Wagner had reached any conclusion that Moody was *not* experiencing cognitive impairment. The analysis in Madireddi's April 5, 2002, evaluation supporting the initial denial of benefits did not address cognitive impairment at all. See AR0-0710-0727. In response to Saal's April 18, 2005, letter reporting, among other things, that the use of narcotic analgesic medications "limit [Moody's] . . . mental capacity," Madireddi merely stated in a conclusory fashion that the letter did not change her conclusions, because it did "not provide additional medical evidence." AR-0655 (Madireddi's addendum report of April 28, 2005). Similarly, Wagner concluded that the medical records "[did] not provide any objective evidence of impairment as a result of the use of medications." AR-0241 (Wagner's evaluation of November 1, 2005). To support her conclusion, Wagner did rely on Hines's medical records, which according to Wagner showed that Moody's

13

cognitive status had remained intact. However, her conclusion was simply that there was no objective medical evidence and nothing more.[4]

18. Liberty does not point to any provision of the policy that sets forth a requirement of objective evidence, and the court has identified none. The fact that Liberty nevertheless rejected Moody's consistent complaints of cognitive impairment solely on the grounds of a lack of objective evidence strongly suggests that Liberty failed to act as a fiduciary and its conflict of interest should be weighed more heavily.

    ii.  <u>Selective Review of Moody's Social Security Record</u>

19. About a year after Liberty's final denial of Moody's benefits, Moody's counsel reported to Liberty that Moody had been granted Social Security benefits. AR-0094. This occurred after Liberty made its benefits determination; therefore, it cannot be used to determine whether Liberty abused its discretion in deciding to terminate benefits. However, evidence extrinsic to the administrative record can be considered by the court in determining whether a plan administrator apparently acted out of its conflict of interest. See <u>Abatie</u> at 970.

20. Defendant notes that the mere fact that a claimant has been awarded Social Security disability benefits is not controlling upon eligibility under a given long term disability benefits plan. See <u>Madden v. ITT Long Term Disability Plan</u>, 914 F.2d 1279, 1285 (9th Cir. 1990); <u>O'Neil v. Fireman's Fund Am. Ret. Plan</u>, 2005 U.S. Dist. LEXIS 43530 (N.D. Cal. 2005) (Wilken, J.), at *21-22. Yet when, as here, <u>see</u> A-1303, an administrator encourages a claimant to argue to the Social Security Administration that he can do no work and then ignores the agency's finding, such a course of action can support both weighing the conflict of interest more heavily and finding an abuse of discretion. <u>Glenn</u> at 2352.

14

21. In this case, Liberty received notification on December 14, 2006, that Moody had been awarded Social Security benefits. AR-0094.[5] Liberty contends that it had no obligation to consider the information at that point, because the information came more than a year after Liberty's benefits determination and because "[t]he Plan provided for one appeal, which Liberty conducted fully and fairly." Def.'s Opp. at 19. Liberty fails to cite any portion of the plan limiting the number of appeals to one, and the court has been unable to identify such a provision. There being no such limitation, Liberty was obligated in such a circumstance to act in accordance with its fiduciary responsibilities. Belaying its protestations that it was too late to reexamine the claim, Liberty instead reviewed and analyzed exactly one piece of evidence: Madireddi's August 2005 in-person medical examination of Moody. Liberty rejected Moody's request to consider the rest of the information because "we [Liberty] have additional physician reviews, which did not contribute to the rationale for the Social Security award." AR-0090. Liberty then regurgitated the same independent evaluation excerpts it had used in previous rejections, concluding, "Therefore, our position remains unchanged."

22. Liberty did not give consideration to how the grant of Social Security benefits and the underlying medical documents might reflect upon the merits of Moody's claim under the policy. It did not ask for the full Social Security file to review. It analyzed and attempted to refute one report from the Social Security file and ignored the others. These are the actions of an adversary, not a fiduciary. Such actions contribute to a finding that Liberty's conflict of interest must be weighed heavily.

### A. Abuse of Discretion

23. Liberty's conflict of interest will be weighed as a strong factor in the determination of whether an abuse of discretion occurred. Several other factors are relevant. Liberty rejected Moody's claims of cognitive impairment without any basis. Liberty also ignored the physical requirements of Moody's job as stated by its own evaluators.

### i. Cognitive Impairment

24. Moody was employed by Synopsis, Inc., as an project engineer. His job required not merely physical labor but also a certain level of mental acuity. See AR-1047-1052 (Department of Labor occupational description for "project engineer"). As noted, Liberty appears to have based its rejection of Moody's cognitive impairment claims on nothing more than Dr. Wagner's finding that there was no "objective information" to support Moody's subjective reports. Strikingly, the requirement to provide objective information to support cognitive impairment was never articulated by Liberty until the letter denying Moody's appeal. See AR-0648-0653 (initial denial letter). This was too late to provide Moody with the opportunity to provide such evidence, even if it had been defined clearly enough for him to understand what would be necessary to fulfill the requirement. See Saffon, 522 F.2d at 871 (finding insurance company's first clarification of denial rationale only in final denial of claim "came too late to do [plaintiff] any good").

25. Analysis of cognitive impairment was clearly an afterthought in Liberty's review. When Liberty did finally address the issue, it did so too late, and it denied benefits due to a failure to provide objective evidence, which is not a requirement of the policy. This was an abuse of discretion.

### ii. Altered Job Requirements

26. Liberty also abused its discretion by ignoring the conclusions of the functional capacity evaluation (FCE) conducted on March 7, 2005. See AR-0767. Liberty chose the evaluator and required Moody to participate in the evaluation, pursuant to the terms of the policy. The evaluator concluded that Moody was capable of working only in the sedentary physical demand category. Id. Liberty's own vocational analysts found that Moody's occupation fell within the "light" physical demand category, a step above "sedentary." Liberty now argues that the evaluator misunderstood the requirements of Moody's occupation. However, if the evaluator had made a mistake, Liberty

had the right under the policy to require Moody to take another FCE or other test. Liberty did not do so, and so its protestations that the FCE was mistaken fail to persuade.[6]

27. It is also questionable whether Liberty made its benefits determination using the correct physical demand category. Liberty's October 10, 2005, letter from Chuck Johnson correctly stated that Moody's occupation fell within the *light* physical demand category. However, Johnson's internal Appeal Recommendations providing the basis for the letter concluded: ". . . the clmt has the capacity to perform a *sedentary* occupation . . . The medical information supports he can perform a *sedentary* occupation . . . Maintain denial – not TD own occupation." AR-0469 (emphasis added).

28. Liberty's selectivity in crediting its own FCE is an abuse of discretion. See Gellerman v. Jefferson Pilot Fin. Ins. Co., 376 F. Supp. 2d 724, 734 (S.D. Tex. 2005) ("An administrator is not allowed to pick and choose evidence on which to rely as it did in this case. This manner of handling the evidence amounts to an abuse of discretion because the defendants ignored key statements and conclusions in the FCE."). Liberty's internal misstatements of the correct physical demand category further suggest that the exercise of discretion was arbitrary and capricious.

17

CONCLUSION

For the foregoing reasons, the court finds that defendant abused its discretion in denying plaintiff benefits during the "own occupation" term of the policy. Plaintiff's motion for judgment is GRANTED, and defendant's motion for judgment is DENIED. Defendant SHALL pay plaintiff benefits owed for the entire period of coverage under the "own occupation" provisions of the policy, minus any applicable offsets from Social Security benefits, state disability benefits, or other sources provided in the policy, including the $19,951.27 plaintiff owes from prior overpayments. The parties shall jointly file, within thirty days, a proposed judgment specifying the exact amount to by paid.

Having decided that plaintiff was not disabled under the "own occupation" provision of the policy, defendant has not made a determination whether plaintiff is or was disabled under the "any occupation" policy provision at any time during the applicable time frame. The court REMANDS the question of plaintiff's disability under the "any occupation" standard to defendant for determination according to its fiduciary duties and in a manner consistent with this memorandum and order. Defendant SHALL take into account in its initial determination any relevant evidence submitted by or on behalf of plaintiff within the next sixty days.

IT IS SO ORDERED.

Dated: 1/23/2009

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

## **ENDNOTES**

1.  There was some confusion about whether these motions were brought as motions for summary adjudication under Rule 52 or summary judgment under Rule 56. Liberty moved for summary adjudication. Moody initially styled his motion as one for summary judgment, although his moving papers are entirely adequate to support a Rule 52 motion. At oral argument, Moody's counsel agreed that these motions could be considered Rule 52 motions.

Normally, an administrative record is reviewed on a summary judgment motion, since the facts are limited to the record and there can therefor be no genuine dispute of material fact. However, the Ninth Circuit has instructed that when an ERISA plan administrator or insurance company has retained discretionary authority to interpret the terms of a plan, the court must make something "akin to a credibility determination" about the reasons for denying coverage pursuant to the provisions of that policy and on that administrative record. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 969 (9th Cir. 2006). The court considers these motions to be Rule 56 motions; however, insofar as the court relies upon findings of fact, the motions will be considered Rule 52 motions. Accordingly, this memorandum and order is organized to contain separate findings of fact and conclusions of law, per the requirements of Rule 52(a)(1).

2.  As in Savafi, the court in Frost v. Metropolitan Life Ins. Co., 470 F. Supp. 2d 1101 (C.D. Cal. 2007), found the administrator's use of an objective evidence requirement to be unobjectionable. That case is distinguishable from the case at bar in that the additional evidence in Frost bolstered the conclusion that the plaintiff's illness was not so severe to prohibit her from working, rather than contradicting such conclusion. Id. at 1109.

3.  Liberty makes much of the fact that Moody traveled on some occasions, including trips to Seattle and the East Coast, and a cruise. These do not have any rational bearing upon cognitive ability. As for physical ability, it is unreasonable to conclude from the fact that an individual tolerated a few hours on an airplane trip at a particular time that he can work full time on a continuous basis. See Caplan v. CNA Financial Corp., 544 F. Supp. 2d 984, 993 n.5 (N.D. Cal. 2008) (Wilken, J.).

4.  Liberty points to numerous indications in Hines's records that purportedly suggest Moody was not suffering from cognitive impairment. See Def.'s Opp. at 15-17. Moody likewise points to several observations by Hines purportedly supporting a finding of cognitive impairment. See Pf.'s Opp. at 8. Whatever value these observations might have had in adjudicating the claim, there is no evidence in the Administrative Record indicating which parts of Hines's records Liberty or any of its reviewing physicians reviewed. The only reference to the records received from Hines is Wagner's statement that the records showed Moody's cognitive status to be intact. The only conclusion she drew, however, was that there was no "objective evidence of impairment." AR-0241. While the arguments made and evidence cited by Liberty's lawyers in the instant action might perhaps have supported a claim rejection, there is no evidence that they were considered by Wagner or Liberty, particularly since they too contained only Moody's self-reports and Hines's observations, i.e., no objective evidence. That Liberty's lawyers have come up with new arguments now does not change whether or not the earlier rejection decisions were an abuse of discretion or were based on a conflict of interest.

5.  Liberty makes much of the fact that the Social Security award letter itself was not turned over to Liberty until October 2008. This ignores the fact that Liberty's December 28, 2006, letter acknowledged and assumed as true that there was a Social Security award. AR-0090.

6.  Liberty had also received the opinion of Dr. Saal stating that the FCE had not tested Moody's most important physical limitation: sitting. Yet Liberty did not request any further assessment to test that capacity.